656 F.2d 902
 16 ERC 1467, 11 Envtl. L. Rep. 20,924
 STATE OF CONNECTICUT and State of New Jersey, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, United States Environmental
Protection Agency, Respondents,
and
Consolidated Edison Company of New York, Inc. and Robert F.
Flacke, Commissioner, New York State Department of
Environmental Conservation, Intervenors.
 No. 564, Docket 80-4176.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 5, 1981.
Decided Aug. 4, 1981.
 
 Carl R. Ajello, Atty. Gen., Alan M. Kosloff, Kenneth Tedford, Asst. Attys. Gen., State of Conn., Hartford, Conn., for petitioner State of Conn.
 John J. Degnan, Atty. Gen. of N. J., Stephen Skillman, Asst. Atty. Gen., Richard M. Hluchan, Deputy Atty. Gen., Trenton, N. J., for petitioner State of N. J.
 Michele Beigel Corash, Gen. Counsel, E. P. A., Bruce Diamond, Atty., E. P. A., Angus MacBeth, Acting Asst. Atty. Gen., Land and Natural Resources Div., Donald W. Stever, Jr., Chief, Pollution Control Section, Land and Natural Resources Div., Diane L. Donley, Atty., Pollution Control Section, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for respondents.
 Garrett E. Austin, Thomas J. Farrelly, New York City, for intervenor Consolidated Edison.
 Shirley A. Siegel, Sol. Gen., Albany, N. Y., Marcia J. Cleveland, Mary L. Lyndon, Asst. Attys. Gen., Robert Abrams, Atty. Gen. State of N. Y., New York City, for intervenor State of N. Y.
 Before WATERMAN, MANSFIELD and KEARSE, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 The States of Connecticut and New Jersey petition for review of a "final rule" promulgated by the Environmental Protection Agency (EPA) which approved a revision to New York's state implementation plan ("SIP") for air pollution control. Although the petition raises difficult substantive and procedural questions with reference to the abatement of interstate air pollution, we discern no basis for overruling the agency determination.
 
 I.
 
 2
 The Clean Air Act, 42 U.S.C. § 7401 et seq. (1976 & Supp.1979), (CAA),[1] places upon the states the "primary responsibility" for the maintenance of air quality standards. CAA § 107(a), 42 U.S.C. § 7407(a). Pursuant to § 110 of the Act, 42 U.S.C. § 7410, each state has adopted a state implementation plan, or "SIP," which details its program for attainment and maintenance of the EPA-promulgated "national ambient air quality standards" (NAAQS) (see CAA § 109, 42 U.S.C. § 7409). New York's SIP is set forth at 40 C.F.R. § 52.1670 et seq. A proposed change in the New York SIP gives rise to the present dispute.
 
 
 3
 On February 4, 1979, the Consolidated Edison Company of New York, Inc. ("Con Edison") petitioned the New York State Department of Environmental Conservation (DEC) for permission to perform a one-year experiment, or "test burn," whereby Units 2 and 3 of its Arthur Kill Generating Facility on Staten Island, New York, and Unit 3 of its Ravenswood Generating Facility in Queens, New York, would be allowed to use fuel oil with a maximum sulfur content of 1.5% by weight. In particular, Con Edison wished to analyze the sulfur dioxide emissions produced by 1.5% sulfur oil, inasmuch as apparently these emissions are roughly equal to those produced by the 1% sulfur coal which the company hopes to utilize in the future as part of a long-term Con Edison energy conservation program. DEC authorization of the "test burn" was necessary because of the .3% limitation on sulfur in oil imposed by state air pollution regulations, see 6 NYCRR Part 225. After a public hearing was held and after considerable technical data was considered by the DEC's Regional Director, the State Commissioner of Environmental Conservation, acting pursuant to his power under 6 NYCRR 225.2(c), issued a one-year "special limitation" allowing the "test burn."
 
 
 4
 As New York's sulfur-in-fuel regulations have been incorporated into the state's SIP, EPA approval of the "special limitation" was necessary before testing could begin. CAA § 110(a)(3)(A), 42 U.S.C. § 7410(a)(3)(A); 40 C.F.R. § 51.6. Accordingly, the "special limitation" was submitted to the EPA on November 29, 1979. Pursuant to 40 C.F.R. Part 52, the EPA published a notice of proposed rulemaking for approval of the "special limitation" on January 17, 1980. 45 Fed.Reg. 3331. Public comment was invited, with comments required to be received by February 19. The comment period was subsequently extended to March 4 (see 45 Fed.Reg. 12266, Feb. 25, 1980).
 
 
 5
 The States of New Jersey and Connecticut, the petitioners herein, commented. Their comments expressed concern that an approval of the New York SIP revision would endanger regional economic growth and have a strong, undesirable impact on air quality within their own state boundaries. These comments led EPA to re-open the comment period so that the issues raised by the two states could be addressed by all interested parties. 45 Fed.Reg. 26101 (April 17, 1980). During this extended period, Connecticut and New Jersey formalized their opposition to the revision by filing petitions under CAA § 126(b), 42 U.S.C. § 7426(b),[2] which provides that any state may petition the EPA Administrator for a finding that a pollution source in another state violates the Act's interstate pollution provisions.
 
 
 6
 On August 11, 1980, EPA approved the New York SIP revision. The agency found that the one-year "test burn" would not violate any National Ambient Air Quality Standard (NAAQS), or exceed any maximum allowable increase in pollutants as set forth in the Clean Air Act's provisions for prevention of significant deterioration in air quality ("PSD"). Approval of the revision, however, was made contingent upon conversion by Con Edison from oil to natural gas at several sites in Manhattan. The EPA took no action with reference to the § 126(b) petitions filed by New Jersey and Connecticut. Nor did it act on a request by the State of Connecticut on August 13, 1980 for a stay of its final rule.
 
 
 7
 On September 9, 1980, Connecticut and New Jersey filed a joint petition for review of the EPA action. We permitted Con Edison and the State of New York to intervene as respondents. On December 3 and 4, 1980, the EPA held a public hearing on the § 126(b) petitions filed by Connecticut and New Jersey. No final determination has yet been made.
 
 II.
 
 8
 At the outset intervenor New York State argued that this court lacks jurisdiction to review EPA's approval of the SIP revision inasmuch as the § 126(b) petitions are still pending. New York urged that, in view of the possibility that EPA should grant the relief requested in petitioners' § 126(b) applications and the "test burn" thereby be blocked, the doctrine of "primary jurisdiction" precludes judicial review at this time. We disagree. The "primary jurisdiction" doctrine governs the question of whether a particular issue or claim is "initially cognizable" in a court action or must be presented to an administrative agency for determination in the first instance. See United States v. Western Pac. R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 164-165, 1 L.Ed.2d 126 (1956); 3 K. Davis, Administrative Law Treatise, § 19.01 (1958 & Supp.1976). Its usefulness lies in identifying the proper initial forum. Where, as here, there is uncertainty as to the proper time for judicial review, the concept of "primary jurisdiction" is of no relevance.[3]
 
 
 9
 New York's argument appears to be that New Jersey and Connecticut will not have exhausted their administrative remedies with reference to New York's SIP revision application until their § 126(b) petitions are ruled upon. The relationship between these two petition procedures is central to the merits of this case and will be more fully discussed below (see III, infra). At this point we merely note that there is absolutely no authority to the effect that exhaustion of the § 126(b) procedure is a condition precedent to a judicial review of an EPA approval of an SIP revision. The EPA Administrator's grant or denial of such an approval is a final administrative action reviewable by the Courts of Appeals under the Clean Air Act's judicial review provision, § 307(b), 42 U.S.C. § 7607(b). See, e. g., U. S. Steel Corp. v. EPA, 633 F.2d 671 (3d Cir. 1980). To impose an additional, judicially-created barrier to such a review would be grossly inappropriate for reasons which are graphically illustrated by the present case. EPA's approval of the New York SIP revision has already taken effect and the "test burn" has commenced. The petitioning states are immediately concerned with the deleterious effects which the "test burn" may have during the period preceding final agency action on their § 126(b) petitions. To defer the exercise of our jurisdiction until such time as EPA renders its final decision on those petitions would thus effectively moot this entire dispute.
 
 
 10
 We therefore turn to the merits of petitioners' contentions.
 
 III.
 
 11
 Petitioners' first contention is that EPA erred by rendering a final decision on New York's SIP revision application without first completing proceedings on the § 126(b) petitions filed by them during the comment period. Although this objection is essentially procedural, it requires us to analyze not only the SIP revision process but also the Clean Air Act's provisions dealing with interstate air pollution abatement.
 
 
 12
 Our starting point is CAA § 110(a)(2), 42 U.S.C. § 7410(a)(2), the section of the Act which sets forth the requirements which must be met by state implementation plans. As SIPs are designed to promote timely attainment of national air quality standards, each of § 110(a)(2)'s several paragraphs addresses a particular aspect of the implementation and the maintenance of these standards. Various provisions, for instance, require each SIP to establish emissions limitations (§ 110(a)(2)(B), 42 U.S.C. § 7410(a)(2)(B)), to provide assurances that the state will provide personnel and funding adequate to achieve plan goals (§ 110(a)(2)(F)(i), 42 U.S.C. § 7410(a)(2)(F)(i)) and to mandate a program of periodic motor vehicle inspection (§ 110(a)(2)(G), 42 U.S.C. § 7410(a)(2)(G)). Paragraph (E) describes the provisions which an SIP must contain with reference to interstate air pollution. As originally enacted, this paragraph merely required that each SIP make "adequate provisions for intergovernmental cooperation." Congress, however, finding that paragraph (E) offered an inadequate answer to a serious problem, strengthened it considerably as part of the Clean Air Act Amendments of 1977, Pub.L. 95-95, 91 Stat. 685 (1977). See H.R.Rep.No. 294, 95th Cong., 1st Sess. 329-31, reprinted in (1977) U.S.Code Cong. & Ad.News 1077, 1408-10. As amended, § 110(a)(2)(E) reads:
 
 
 13
 The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that
 
 
 14
 (E) it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement.
 
 
 15
 The interstate pollution abatement provisions of an SIP, like all other aspects of the plan, may be revised with the approval of the EPA Administrator. The revision process is governed by CAA § 110(a)(3)(A), 42 U.S.C. § 7410(a)(3)(A), which states that:
 
 
 16
 The Administrator shall approve any revision of an implementation plan ... if he determines that it meets the requirements of paragraph (2) and has been adopted by the State after reasonable notice and public hearings.
 
 
 17
 As is illustrated by Congress's use of the word "shall," approval of an SIP revision by the EPA Administrator is mandatory if the revision has been the subject of a proper hearing and the plan as a whole continues to adhere to the requirements of § 110(a)(2). Union Electric Co. v. EPA, 427 U.S. 246, 257, 96 S.Ct. 2519, 2525, 49 L.Ed.2d 474 (1976); Mision Indus., Inc. v. EPA, 547 F.2d 123 (1st Cir. 1976). Applying this principle specifically to the interstate aspects of an SIP, it becomes clear that EPA must approve an SIP revision regardless of its interstate impact as long as the revision will not violate the standards set forth in § 110(a)(2)(E).
 
 
 18
 The Act's other provision regarding interstate pollution disputes, referred to in § 110(a)(2)(E)(ii), is § 126, 42 U.S.C. § 7426. This section was added to the Act as part of the 1977 amendments. Subsection (a) states that each state implementing an SIP shall give nearby states a notice of at least sixty days before the commencement of construction of any new possible pollutant source where the air quality of those neighboring states may be significantly affected by emissions from pollution sources. Subsection (b) provides that
 
 
 19
 (a)ny State or political subdivision may petition the Administrator for a finding that any major source emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(E)(i) of this title. Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition.
 
 
 20
 Subsection (c) goes on to detail the process by which EPA shall enforce determinations made pursuant to subsection (b).
 
 
 21
 After a careful review of these portions of the Act, their legislative history and relevant case law, we conclude that where a state files a § 126(b) petition in order to challenge a neighboring state's proposed SIP revision, completion of the § 126(b) procedure is not a prerequisite to EPA approval, pursuant to § 110(a)(3)(A), of the revision. Petitioners rely principally upon § 110(a)(2) (E)(ii)'s requirement that an SIP must contain provisions "insuring compliance with (§ 126)." Inasmuch as, as noted above, § 110(a)(3)(A) incorporates all the requirements of paragraph (E) into the SIP revision process, petitioners reason that no revision may be approved until § 126(b) proceedings are completed. A sensible reading of the language of the Act, however, cannot support such an interpretation. When § 110(a)(2)(E)(ii) requires an SIP to insure compliance with § 126, it clearly refers to subsection (a) only and not to the petition procedure set forth in subsection (b). Subsection (a) of § 126 is really an extension of § 110(a)(2) in that it describes further pollution-control measures which must be present in every SIP. It is thus altogether natural that § 110(a)(2)(E) would incorporate it by reference. Subsection (b) of § 126, on the other hand, cannot rationally be so incorporated. It directs the EPA Administrator to hold a hearing and make a determination within a given time period. Since state officials obviously cannot control the Administrator's actions, it defies logic to require the state's implementation plan to insure that EPA comply with the statutory procedure.
 
 
 22
 In a larger sense, petitioners have misapprehended the relationship between the SIP revision process and the § 126(b) petition procedure. In approving an SIP revision which will have interstate ramifications, EPA is required by § 110(a)(3)(A) to observe the substantive standard set forth in § 110(a)(2)(E) (i), i. e., whether pollutants will be emitted in quantities likely to block another state's attainment and maintenance of an NAAQS or interfere with measures required to be adopted under the Act's PSD provisions. § 126(b) by its own terms adopts this same standard. As the substantive inquiry for decision is the same in both proceedings, an argument that one proceeding must be completed as a prerequisite to a final decision in the other makes no sense.
 
 
 23
 In view of the broad overlap between the two procedures, and noting that they call for the same substantive inquiry, it seems clear that they are intended to be utilized in differing procedural settings. As the SIP revision process is set forth comprehensively in § 110(a)(3) and was already in place when § 126(b) was enacted in 1977, § 126(b) appears to have been primarily designed as a means for resolving interstate pollution disputes in situations where an SIP is not being revised. This analysis is consistent with the Supreme Court's discussion of the SIP revision process in Train v. Natural Res. Def. Council, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). In holding that § 110(a)(3) (A) is the proper vehicle for approving SIP variances to individual pollution sources not interfering with attainment of national air quality standards, the Train Court emphasized the limited role to be played by the federal government in setting emissions limits once an initial SIP has been submitted and approved. Id. at 79-80, 95 S.Ct. at 1481-1482. To hold that the § 126(b) procedure, which involves an independent public hearing to be held by the EPA Administrator, may be invoked whenever an SIP revision is submitted and must be completed as a prerequisite to approval of the SIP revision, would be contrary to the spirit of the Court's comprehensive opinion in Train.[4]
 
 
 24
 Of course, we do not hold that it would never be proper for EPA to consolidate a § 126(b) petition with an SIP revision application under § 110(a)(3)(A). Indeed, such a procedure would probably have saved considerable time and energy in the present case.[5] We merely conclude that EPA's failure to conclude § 126(b) proceedings prior to its approval of New York's SIP revision does not constitute grounds for vacating that approval.
 
 IV.
 
 25
 Petitioners' second contention warrants little discussion. They claim that EPA erred by failing to assess the aggregate impact which a long-term use of high-sulfur oil by pollution sources in New York would have upon air quality in downwind states. The simple answer to this contention is that the issue of long-term effects was not before the EPA Administrator. The "special limitation" as approved by New York State is explicitly limited to one year's duration. Although the Administrator could properly have inquired into the potential effects of long-term use of high-sulfur oil as a factor to be considered in weighing the merits of the proposed one-year "test burn," he was not obligated to do so. In considering an SIP revision under § 110(a)(3) (A), the proper inquiry is whether the particular revision itself will cause the plan to fail to meet the standards set forth in § 110(a)(2). See Train, supra, at 93, 95 S.Ct. at 1488. Since qualifying revisions are to be "readily approved," Id. at 77, 95 S.Ct. at 1480-1481, the Administrator's failure to address the complex and necessarily speculative issue of high-sulfur oil use's long-term impact does not justify overturning his ruling.
 
 
 26
 Petitioners' fear that New York can permanently avoid any inquiry into the long-term effects of high-sulfur oil use by enacting a series of short-term SIP revisions is unfounded. As we have just noted, EPA may, in its discretion, properly inquire into the long-term prospects as part of the revision process even when only a short-term revision is proposed. Submission of consecutive one or two-year test burns would undoubtedly prompt the Agency to do just that. Moreover, the long-term issue is one which may be broached as part of the § 126(b) process. That this latter option is available is illustrated by the present case, for the Administrator has expressed his intention to investigate the long-term interstate impact of high-sulfur oil use as part of the § 126(b) proceedings pursuant to the Connecticut and New Jersey petitions.
 
 
 27
 Nor is there any merit to the argument that EPA was required to investigate the potential interstate impact of high-sulfur fuel use by multiple pollution sources in New York. The "special limitation" was granted only as to Con Edison's Arthur Kill and Ravenswood sites. For purposes of a revision application under § 110(a)(3)(A), "the proper inquiry is directed to the emissions of a particular source of pollution ...," Ohio Envir. Council v. EPA, 593 F.2d 24, 30 (6th Cir. 1979) (emphasis supplied). Should the state attempt to adopt a new SIP revision allowing high-sulfur fuel use at additional sites to these two sites, a new § 110(a)(3)(A) application will have to be submitted and the interstate impact of multiple-site emissions can be addressed at that time.
 
 V.
 
 28
 Finally, petitioners contend that EPA was required to consider the potential impact of the "test burn" upon efforts to attain air quality standards established by state law. Specifically, Connecticut and New Jersey both claim that EPA, in approving New York's SIP revision, failed to take into account their own adopted state standards for sulfur dioxide emissions, standards which are more strict than the relevant federal rules.
 
 
 29
 CAA § 116, 42 U.S.C. § 7416, provides that the states shall be free to adopt air quality standards more stringent than required by the NAAQS or other federal law provisions. Nothing in the Act, however, indicates that a state must respect its neighbor's air quality standards (or design its SIP to avoid interference therewith) if those standards are more stringent than the requirements of federal law. Indeed, § 110(a)(2)(E) appears to have been carefully drafted to preclude any such interpretation. It provides that each SIP must assure that nearby states will not be hindered in attaining any "national primary or secondary ambient air quality standard" or implementing any "measures required to be included in (its SIP) under part C of (the Act) to prevent significant deterioration of air quality ..." The clear intent of the statute is to require interstate comity only insofar as is necessary to allow each state to comply with the NAAQS and the Act's PSD provisions.
 
 
 30
 Nevertheless, petitioners contend that the EPA was obligated to consider the neighboring states' air quality standards before approving the SIP revision. They rely primarily on the legislative history of the Act's interstate pollution abatement sections, and they place particularly strong emphasis upon a footnote to the House Report, supra, which appears to state that in affording interstate protection to NAAQS and PSD attainment measures, the legislators intended also to prevent interference with state air quality standards no matter how strict those standards might be.[6]
 
 
 31
 We do not find it necessary to investigate the legislative history of the relevant statutes, for § 110(a)(2)(E)(i) is quite explicit in limiting interstate protection to federally-mandated pollution standards. Where the text of a statute is unequivocal, there is no need to speculate as to Congress's intent in enacting it. Southeastern Commun. Coll. v. Davis, 442 U.S. 397, 99 S.Ct. 236, 60 L.Ed.2d 980 (1979); United States v. Oregon, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961). It may be that the House Report and other legislative materials relied upon by petitioners do not accurately reflect Congress's intent in passing the final version of the interstate pollution provision, and it may be, as intervenor Con Edison suggests, that the scope of federal intervention in interstate pollution controversies was narrowed at the last moment by the House-Senate Conference Committee which drafted many of the 1977 amendments. In any event, it would be inappropriate to speculate as to Congress's intent regarding state air quality standards where to do so could only result in contravention of the Act's unambiguous terms. In construing the Clean Air Act, we are compelled to follow the statute's plain meaning, "even though effectuating that meaning may have undesirable public policy ramifications." Manchester Envir. Coalition v. EPA, 612 F.2d 56, 60 (2d Cir. 1979), citing TVA v. Hill, 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978).
 
 
 32
 We are aware of the EPA Administrator's announced intention to consider New Jersey's and Connecticut's state air quality standards in passing upon the pending § 126(b) petitions. 45 Fed.Reg. 72707 (Nov. 3, 1980). Our holding that EPA is not obligated to consider state law before approving an SIP revision under § 110(a)(3)(A) is not also a determination that EPA is prohibited from doing so when confronted with a § 126(b) petition. Since our review today is limited to the agency's approval of New York's § 110(a)(3)(A) application, this issue is not now before us.
 
 
 33
 Petition for review denied.
 
 MANSFIELD, Circuit Judge:
 
 34
 I concur in the result.
 
 
 
 [1]
 Hereinafter, all references to "the Act" or "CAA" are to the Clean Air Act
 
 
 [2]
 This subsection of the Act is quoted in full infra, at pp. 906-907
 
 
 [3]
 Concededly, the "primary jurisdiction" doctrine would bar us from passing upon the merits of the Connecticut and New Jersey § 126(b) petitions, since EPA has not yet completed its proceedings thereon. We also recognize that some of the issues raised in the present case may necessarily be similar to those which will be raised should an interested party seek judicial review of EPA's eventual decision on the § 126(b) petitions. However, these considerations do not impair our jurisdiction to review EPA's approval of the SIP revision under the entirely separate provisions of § 110(a)(3)(A)
 
 
 [4]
 Our holding is also consistent with the legislative history of § 126(b). In approving its version of § 126(b), the House Interstate and Foreign Commerce Committee stated that the petition process it sets forth "is intended to expedite, not delay, resolution of interstate pollution conflicts." House Report, supra, at 331, U.S.Code Cong. & Admin.News 1978, p. 1410. In rejecting the notion that the § 126(b) procedure must be exhausted as a prerequisite to commencement of a "citizen suit" under § 304 of the Act, 42 U.S.C. § 7604, the committee went on to state that the § 126(b) process is designed to provide an "entirely alternative method and basis for preventing and abating interstate pollution." Id. (emphasis supplied). These comments bolster our conclusion that EPA may approve a SIP revision without requiring interested parties to expend the time and effort necessary to complete the § 126(b) process
 We also note that the District of Columbia Circuit, in a recent discussion of the Act's interstate provisions, viewed § 126(b) as an independent vehicle for challenging the legality of interstate pollution and made no mention of a requirement that it be exhausted where approval for an SIP revision is sought. Alabama Power Co. v. Costle, 636 F.2d 323, 366-7 (D.C.Cir.1980).
 
 
 [5]
 Nor do we condone EPA's seeming disregard of § 126(b)'s requirement that a hearing be held within 60 days after receipt of a petition. The agency has offered neither explanation nor excuse for its tardiness. Had it timely fulfilled its statutory responsibilities, the proceedings under § 126(b) could easily have been consolidated for decision along with New York's § 110(a)(3)(A) application
 
 
 [6]
 House Report, supra, at 331 n. 14, U.S.Code Cong. & Admin.News 1977, p. 1410 n. 14. The passage reads:
 The committee intends that the prohibition against interstate pollution which interferes with prevention of significant deterioration plans in new section 110(a)(2)(E) and new section 126 of the act be construed as including a prohibition on interstate pollution which prevents timely attainment or maintenance of State or local ambient air quality standards or other measures adopted under section 116 of the act. The prohibition should also be construed to protect State or local plans to prevent significant deterioration which are more stringent than is required by ... the act. The same considerations apply for the purpose of the visibility protection provisions of new section 161 of the act.