739 F.2d 1071
 21 ERC 1145, 82 A.L.R.Fed. 277, 14
Envtl. L. Rep. 20,573
 AIR POLLUTION CONTROL DISTRICT OF JEFFERSON COUNTY,
KENTUCKY, Petitioner,
Public Service Company of Indiana, Inc., Intervenor,
v.
The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and Anne
M. Gorsuch, Administrator, U.S. Environmental
Protection Agency, Respondents.
 No. 82-3214.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 1, 1983.
Decided July 10, 1984.
 
 Gaylord B. Ballard, argued, Air Pollution Control Dist. of Jefferson County, Ky., Louisville, Ky., for petitioner.
 Anne M. Gorsuch, Administrator, U.S. Environmental Protection Agency, Barbara Sih, Diane Donley, (Lead Counsel), argued, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for respondents.
 Gregory A. Troxell, argued, Public Service Company of Ind., Inc., Plainfield, Ind., for intervenor Public Service Co. of Indiana, Inc.
 Carey Rosemarin, U.S. Environmental Protection Agency, Region V, Louise Gross, Chicago, Ill., for respondent, EPA.
 Before ENGEL, MARTIN and CONTIE, Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 The Air Pollution Control District of Jefferson County, Kentucky, seeks review of an order of the Environmental Protection Agency ("EPA"), reported at 47 Fed.Reg. 6624 (Feb. 16, 1982). That order denied Jefferson County's petition for interstate pollution abatement, filed pursuant to section 126 of the Clean Air Act, 42 U.S.C. Sec. 7426(b) (Supp. V 1981). Jefferson County sought relief upon its claim that the Gallagher Power Station ("Gallagher") in southern Indiana emits air pollutants in violation of section 110 of the Act, 42 U.S.C. Sec. 7410(a)(2)(E)(i) (Supp. V 1981).[1] In that connection, Jefferson County sought a reduction of sulfur dioxide ("SO2 ") emissions from the Gallagher generator. The County claimed that Gallagher's SO2 emissions violated the provisions of the Clean Air Act which prohibit emissions in one state that prevent the attainment or maintenance of national ambient air quality standards ("NAAQSs") in another state. Id. Jefferson County also maintained that Gallagher's emissions interfered with the margin for future industrial growth that the County had sought to create by placing strict controls on the emission of SO2 by Kentucky sources.
 
 
 2
 The EPA denied Jefferson County's section 126 petition for interstate pollution abatement because it found that Gallagher did not "substantially contribute" to the violation of NAAQSs in Jefferson County.
 
 
 3
 The procedural and substantive issues now raised by Jefferson County are (a) whether the EPA complied with the procedures required by the Clean Air Act in its consideration of Jefferson County's section 126 petition, (b) whether the EPA employed the correct criteria in its computer modeling studies of the impact of Gallagher's emissions, (c) whether 42 U.S.C. Sec. 7601 creates a substantive requirement of regional uniformity in emission standards, (d) whether 42 U.S.C. Sec. 7410(a)(2)(E) requires that a polluting state must "substantially contribute" to a NAAQS violation in another state before the interstate pollution abatement provisions are triggered, and (e) whether 42 U.S.C. Sec. 7410 forbids Gallagher's present emissions even though they are permissible under Indiana's state implementation plan ("SIP") as revised and approved by the EPA. This latter claim is based upon Jefferson County's assertion that section 126 provides a remedy where Gallagher, although not in violation of Indiana's SIP, nonetheless threatens the margin for growth which the County has sought to create.
 
 
 4
 I. The Clean Air Act.
 
 
 5
 Passage of the Clean Air Act ("Act"), 42 U.S.C. Secs. 7401-7642 (Supp. V 1981),[2] substantially increased federal involvement in national air pollution control and at the same time preserved a strong reliance upon state involvement and responsibility. See generally 1 Grad, Treatise on Environmental Law, Sec. 2.03 (1984). The Act directs the Administrator of the EPA to identify and establish air quality standards for pollutants which are harmful to the public welfare. 42 U.S.C. Sec. 7408. That done, the Administrator is required to set primary and secondary NAAQSs[3] for those pollutants. 42 U.S.C. Sec. 7409.
 
 
 6
 In obedience to the statutory mandate, the EPA has set primary and secondary NAAQSs for various pollutants, including sulfur dioxide. 40 C.F.R. Secs. 50.4-.5 (1982). Under the statutory scheme, responsibility for implementing the NAAQSs set by the Administrator then passes to the various states. Each state is required by the Act to devise, adopt and submit to the Administrator for approval a SIP for enforcing the NAAQSs. 42 U.S.C. Sec. 7410(a)(1). Once a state submits its SIP, the Administrator must approve the plan if it meets eleven criteria specified in the Act. 42 U.S.C. Sec. 7410(a)(2)-(3). These criteria include establishment of emission limitations, timetables for compliance with those limitations, provisions for monitoring air quality, and a program to enforce the emission limitations. 42 U.S.C. Sec. 7410(a)(2)(A)-(K). If a state fails to submit a satisfactory plan, the Administrator must devise a plan for the state. 42 U.S.C. Sec. 7410(c)(1).
 
 
 7
 Once a SIP is approved, the state must meet the primary NAAQSs within three years, and attain secondary NAAQSs within a "reasonable" time. 42 U.S.C. Sec. 7410(a)(2)(A).[4] Areas which achieve the NAAQSs are subject to the regulations of Part C of the Act. 42 U.S.C. Secs. 7470-91. Part C is designed to prevent significant deterioration ("PSD") in the air quality of regions which meet the NAAQSs. Part C establishes maximum "increments" by which increased emissions of SO2 can exceed "baseline" concentrations of that pollutant. 42 U.S.C. Sec. 7473. Consequently, in an area where the air is cleaner than the NAAQSs require, Part C permits specified incremental increases in the emission of SO2 so long as maximum allowable concentrations of that pollutant are not exceeded. Id.
 
 
 8
 Areas which do not achieve the NAAQSs are designated as "nonattainment areas" and are subject to the regulations of Part D of the Act. 42 U.S.C. Secs. 7501-08. Part D requires stringent emission limitations to insure compliance with NAAQSs as quickly as possible. Again, like Sec. 7410 of the Act, Part D relies primarily on the state to implement a satisfactory "non-attainment" plan. 42 U.S.C. Sec. 7502. In this respect, the Clean Air Act has been described as "a bold experiment in cooperative federalism," Connecticut v. EPA, 696 F.2d 147, 151 (2d Cir.1982): the EPA identifies the end to be achieved, while the states choose the particular means for realizing that end.
 
 
 9
 Nevertheless, the Act has generated much intergovernmental friction. Critics claim that the state-oriented structure of the Act ignores the realities of air pollution. Since any state's air at a given moment is at best transient, or in bureaucratic terms, "ambient," air pollution in one state inevitably affects the quality of air in surrounding states. Congress acknowledged that the 1970 version of the Act had proved "an inadequate answer to the problem of interstate air pollution" and in 1977 amended the Act to deal specifically with interstate pollution abatement. H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-31, reprinted in 1977 U.S.Code Cong. & Ad.News 1077, 1408-10. The Act, as now amended, provides that to approve any SIP or revision thereto, the Administrator must determine that:
 
 
 10
 (E) [The SIP] contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under Part C of this subchapter to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement ....
 
 
 11
 42 U.S.C. Sec. 7410(a)(2)(E). Under section 126 of the Act, 42 U.S.C. Sec. 7426(b), any state or political subdivision may petition the Administrator for a finding that a major source violates the prohibition of section 7410(a)(2)(E)(i). Jefferson County filed such a section 126 petition with the EPA in these proceedings.
 
 
 12
 However, neither the Act nor its legislative history defines when the emission of a pollutant in one state will be deemed by the Administrator to "prevent attainment or maintenance" of the NAAQSs by another state. This uncertainty provides the basis for the present controversy.
 
 
 13
 II. Regulatory Background and Proceedings Before the EPA.
 
 
 14
 Jefferson County, Kentucky, and Floyd County, Indiana, share a common boundary on the Ohio River. The City of Louisville is located in the northwest portion of populous Jefferson County. In contrast, Floyd County is relatively undeveloped. However, since Jefferson County and Floyd County draw on the same air resources, they, along with Clark County, Indiana, were designated by the EPA as the Louisville Interstate Air Quality Control Region.[5] 40 C.F.R. Sec. 81.35 (1982).
 
 
 15
 Because the structure of the Clean Air Act is state-oriented, each state is charged with implementing national clean air standards within its own political boundaries. Thus, although Floyd County and Jefferson County are in the same air quality control region, each county is subject to the implementation plan adopted by its respective state. Initially this was not a problem, since Indiana and Kentucky had adopted identical emission limitations for the pollutant at issue in this case, SO2 .
 
 
 16
 On May 14, 1973, EPA approved Indiana's SIP for Floyd County. This regulatory scheme set an emission limitation for the Gallagher Power Station of 1.2 pounds of SO2 per million British Thermal Units ("lbs/MBTU") of heat input. Gallagher is situated less than a mile from the Indiana-Kentucky border and is the largest producer of SO2 in Floyd County. In 1972, the EPA had approved Kentucky's SIP which set emission limitations of 1.2 lbs/MBTU of SO2 for the major sources in Jefferson County: three power plants owned by Louisville Gas and Electric.
 
 
 17
 This uniformity of emission limitations in Floyd County and Jefferson County did not last long. In 1974, Indiana adopted new SO2 regulations for Floyd County that completely exempted Gallagher from the 1.2 lbs/MBTU emission limitation, though the plant was required to keep on hand a two week supply of low-sulfur fuel should atmospheric conditions require lower SO2 emissions. At first the EPA proposed to disapprove Indiana's regulation. However, when Indiana submitted technical data which showed that exempting Gallagher from limitations on the emission of SO2 would not interfere with the attainment and maintenance of SO2 standards in either Indiana or Kentucky, the EPA approved the regulation. 41 Red.Reg. 35,676 (Aug. 24, 1976). In 1979, Indiana submitted a revision of the SO2 portion of its SIP to the Agency. The new plan established an emission limitation for SO2 of 6 lbs/MBTU heat input for most Indiana power plants, including Gallagher. This 6 lbs/MBTU limitation represents the amount of SO2 currently emitted by the Gallagher plant without any controls; thus, the new "limitation" effectively maintains the status quo of uncontrolled SO2 emission at Gallagher. On May 26, 1982, EPA proposed to approve the 6 lbs/MBTU limit with respect to the primary NAAQSs in Floyd County, but to disapprove it as to the secondary NAAQS. 47 Fed.Reg. 22,976.
 
 
 18
 Meanwhile, in Jefferson County the 1.2 lbs/MBTU emission limitation was generally enforced. In 1975 Louisville Gas and Electric negotiated consent orders whereby final compliance with the 1.2 lbs/MBTU limitation would be delayed until 1985. However, even with strict emission limitations, Jefferson County has yet to attain the NAAQSs for SO2 , and on February 23, 1978, Jefferson County was designated a Part D non-attainment area for both primary and secondary standards. 43 Fed.Reg. 8964 (Mar. 3, 1978); 40 C.F.R. Sec. 81.318 (1983).
 
 
 19
 It can therefore be seen that a significant disparity exists between the permissible emission limits of power plants in Jefferson County, Kentucky, and the Gallagher plant in Floyd County, Indiana. Louisville Gas and Electric, the primary producer of SO2 in Jefferson County, spent approximately $138 million installing scrubbers to remove SO2 from its emissions, while across the river, Gallagher's SO2 emissions were completely uncontrolled.
 
 
 20
 On May 14, 1979, the Air Pollution Control District of Jefferson County filed a petition for interstate pollution abatement under section 126 of the Clean Air Act, 42 U.S.C. Sec. 7426. The petition requested that EPA find (1) that SO2 emissions from Gallagher are preventing attainment and maintenance of the NAAQSs for SO2 in Jefferson County and (2) that once Jefferson County attains the NAAQSs for SO2 , Gallagher's emissions will interfere with Jefferson County's efforts to prevent significant deterioration of air quality under Part C of the Act. The petition sought tighter controls on Gallagher's SO2 emissions.
 
 
 21
 In response to Jefferson County's section 126 petition, EPA commissioned a computer dispersion modeling study[6] to determine the effect of Gallagher's SO2 emissions on the air in Jefferson County. After the modeling study was completed, EPA held a public hearing regarding the section 126 petition on April 17, 1980, and accepted comments from interested parties until September 3, 1980. In its notice of the hearing, EPA suggested various interstate pollution issues which commentators might address. 45 Fed.Reg. 17,048 (Mar. 17, 1980). Following the hearing, EPA failed to render a decision on the petition despite a statutory requirement that a final decision be made within 60 days. 42 U.S.C. Sec. 7426(b). On December 31, 1980, Jefferson County filed suit in federal district court to compel EPA to either grant or deny the section 126 petition. On May 21, 1981, the district court ordered EPA to make a decision within 60 days.
 
 
 22
 After doing additional computer modeling studies, the EPA, ostensibly to comply with the court order, proposed on July 30, 1981 to deny Jefferson County's section 126 petition. 46 Fed.Reg. 38,937. The EPA stated that Gallagher's uncontrolled SO2 emissions neither cause nor substantially contribute to violations of the SO2 NAAQSs in Kentucky. Id. According to the EPA modeling studies, Gallagher would contribute approximately three percent to those SO2 concentrations in Jefferson County which violated the SO2 NAAQSs. The EPA also rejected Jefferson County's argument that, once the NAAQSs for SO2 were achieved, Gallagher's emissions would interfere with Jefferson County's measures under Part C of the Act to prevent significant deterioration. The EPA stated that it need not consider such potential effects because no PSD measures currently apply to Jefferson County; it was of no consequence, in EPA's view, whether Gallagher might contribute to violations of future PSD measures. In its proposed notice of denial, the EPA published three new criteria for evaluating future section 126 petitions. It acknowledged that Jefferson County had addressed these criteria at the hearing. Id.[7]
 
 
 23
 Thereafter, Jefferson County submitted comments on EPA's proposed denial of the section 126 petition and on the three new criteria. The County disputed several of the factors used by the EPA and conducted its own modeling study, submitting the results to the EPA.[8] The County's modeling, in contrast to the EPA's study, predicted that Gallagher's SO2 emissions alone would repeatedly violate the NAAQSs for SO2 in Jefferson County, even without the addition of background SO2 emissions. The County further contended that the three criteria announced in the proposed notice of denial did not adequately address the issues raised by the petition, and that the Administrator's use of the new criteria denied the County due process.
 
 
 24
 In response to Jefferson County's comments and modeling study, EPA conducted another modeling study using four of the five factors that the County had suggested.[9] The EPA found that these changes made no significant difference in the modeling results. Using either its original figures, or four of the five factors proposed by Jefferson County, EPA calculated that only about three percent of the SO2 concentration at any location in Jefferson County where the NAAQSs are violated is attributable to Gallagher. However, an EPA modeling study also stated that:
 
 
 25
 The highest second-highest predicted impact on a 24-hour average in Kentucky from Gallagher is 126 ug/m[3] [micrograms per cubic meter], which is about 34.5% of the primary NAAQS. This is a substantial portion of the NAAQS and has the potential to limit the increment available to new sources in Louisville. The highest second-highest predicted 3-hour concentration in Kentucky resulting from the plant is 608 ug/m[3]. This represents 47% of the secondary NAAQS, and has a far more serious potential for limiting growth in Kentucky.[10]
 
 
 26
 In fact, the EPA's study concluded that by 1985 Gallagher's emissions "will be the predominate [sic] influence upon air quality in Louisville, Kentucky."
 
 
 27
 Notwithstanding these determinations, the EPA, on February 16, 1982, finally denied Jefferson County's section 126 petition for interstate pollution abatement. 47 Fed.Reg. 6624. The EPA concluded that "the Gallagher plant does not cause or substantially contribute to a violation of the SO2 NAAQS." Id. at 6628.[11] It is from this decision that the Air Pollution Control District of Jefferson County appeals.
 
 
 28
 III. Procedural Issues.
 
 
 29
 Under the Act, we may reverse the action of the Administrator for failure to observe the producers required by law if
 
 
 30
 1) the failure to observe the procedure(s) is arbitrary or capricious, and,
 
 
 31
 2) a specific objection to the procedure employed was raised during the public comment period (or afterward if the grounds for objection arose only after the comment period and the "objection is of central relevance to the outcome of the rule"), and,
 
 
 32
 3) if "the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made."
 
 
 33
 42 U.S.C. Sec. 7607(d)(9)(D) (paraphrased, except where indicated).
 
 
 34
 The District of Columbia Circuit has observed that "[t]he essential message of so rigorous a standard is that Congress was concerned that EPA's rulemaking not be casually overturned for procedural reasons." Sierra Club v. Costle, 657 F.2d 298, 391 (D.C.Cir.1981) (referring to 42 U.S.C. Sec. 7607(d)(9)(D)). Because the statute's conditions are stated conjunctively, a reviewing court may not reverse a decision of the EPA solely because the court determines that the Agency has not observed the procedures required by law. The EPA's failure to observe proper procedures must be arbitrary and capricious, and essentially, go to the heart of the decision-making process to justify reversal.
 
 
 35
 Jefferson County raises various procedural objections. The County contends that the EPA substantially prejudiced the County's rights by delaying the final decision on the section 126 petition far beyond the sixty days mandated by statute. The County's second objection is that the EPA, in making its determination, improperly considered information that was submitted after the close of the official comment period. Finally, the County challenges the EPA's issuance of three new criteria for evaluating section 126 petitions.
 
 
 36
 A. Delay by the EPA.
 
 
 37
 The Clean Air Act provides that any state may petition the Administrator for a finding that a major source in one state emits air pollutants in amounts that prevent another state from either achieving the NAAQSs or from preventing the significant deterioration of air quality. 42 U.S.C. Sec. 7426(b). The statute provides that the Administrator must hold a public hearing on the petition and that, within 60 days after the hearing, "the Administrator shall make such finding or deny the petition." Id.
 
 
 38
 Jefferson County filed its section 126 petition on May 14, 1979; a hearing was not held until April 17, 1980. After waiting 7 1/2 months for a decision, Jefferson County, on December 31, 1980, filed suit in district court to compel a decision. The district court entered an order on May 29, 1981 requiring the Administrator to render a decision on the petition "as expeditiously as possible and in no event later than sixty (60) days" from the order. On July 30, 1981, the Administrator published a proposed determination. Finally, on February 16, 1982, 22 months after the hearing, the EPA denied Jefferson County's petition.
 
 
 39
 Clearly the EPA failed to observe the time requirement of the Act. The County urges that the inordinate delay alone justifies granting the section 126 petition. However, such an approach would be inappropriate for two reasons.
 
 
 40
 Under 42 U.S.C. Sec. 7607(d)(9)(D), the Administrator's procedural errors constitute grounds for reversal only if the failure to observe procedure was "arbitrary and capricious," and the errors were so serious that there is a substantial likelihood that absent the errors, a significantly different result would have been reached. Here, although the delay was excessive in light of the statutory time limit, the County has not established that the delay was "arbitrary and capricious." There were legitimate reasons for the delay. The EPA conducted several modeling studies: one prior to the hearing, one subsequent to the hearing, and one subsequent to the proposed denial of the petition. The EPA received comments following each modeling study and solicited additional information from interested parties throughout this period. We are unable to hold that in the circumstances the delay was clearly arbitrary or capricious; it could well have resulted from EPA's desire to evaluate all comments and to run a sufficient number of modeling studies in response to the comments. Also, the record indicates that much of the delay was attributable to EPA's efforts to take the comments and computer modeling of Jefferson County into account in rendering a decision. Jefferson County simply has not met its burden of establishing a substantial likelihood that a significantly different result would have been reached by EPA absent the delay.
 
 
 41
 The second reason it is inappropriate to grant the section 126 petition in response to EPA's delay is that Jefferson County has already availed itself of the remedy provided under the Clean Air Act. 42 U.S.C. Sec. 7604(a)(2) provides that suits against the Administrator may be brought in federal district court if the Administrator fails to perform an act or duty that is not discretionary. Jefferson County availed itself of this remedy when it obtained a district court order compelling a decision by the Administrator. Although the County may be dissatisfied with this remedy, it appears to be the only relief contemplated under the statute. As the Second Circuit observed regarding the EPA's failure to respond to a section 126 petition before the Agency approved a proposed revision of New York's SIP, "[w]hile we cannot condone the EPA's disregard of this procedural mechanism established by Congress, the Agency's inaction provides no basis for overturning its decision ...." Connecticut v. EPA, 696 F.2d 147, 168 (2d Cir.1982). In fact, the Congressional Conference Committee that considered the 1977 amendments to the Act specifically rejected a Senate amendment which would have treated the Administrator's inaction on a section 126 petition after the 60-day time period as granting the petition. H.R.Rep. No. 564, 95th Cong., 1st Sess. 146 reprinted in 1977 U.S.Code Cong. & Ad.News 1502, 1526-27. Thus, Jefferson County's argument with respect to the delay by the Administrator is not well taken.
 
 
 42
 B. Information Submitted After the Record was Closed.
 
 
 43
 Jefferson County contends that the entire decision-making process was tainted, because the EPA accepted data from the Public Service Company of Indiana ("PSI"), after the close of one of the comment periods. This claim must also fail. Although EPA did receive data after the formal comment period, Jefferson County was neither prejudiced thereby nor was it denied an opportunity for meaningful review.
 
 
 44
 The Clean Air Act does not specify how section 126 proceedings are to be conducted. Consequently, we believe that the Administrator has considerable discretion in determining the extent to which ex parte comments may be considered in a section 126 proceeding. The Act does state that all comments and documents received during the comment period should promptly be placed in the docket; any documents "which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability." 42 U.S.C. Sec. 7607(d)(4)(B)(i) (emphasis added). The D.C. Circuit has read this portion of the Clean Air Act as permitting the EPA to consider comments submitted after the close of the comment period. Sierra Club v. Costle, 657 F.2d 298, 397-98 (D.C.Cir.1981). This seems a reasonable interpretation of section 7607(d)(4)(B)(i), since this subparagraph refers both to comments submitted during the comment period and comments submitted afterward. However, while the Clean Air Act does not require the EPA to reject all information submitted to it outside of the formal comment period, we agree that there must be some check upon ex parte contact with the Agency to ensure that interested parties have an opportunity to comment on important information. The guideline used by the court in Sierra Club v. Costle to determine whether an impermissible ex parte contact had occurred was whether "documents vital to EPA's support for its rule were submitted so late as to preclude any effective public comment." Id. at 398.
 
 
 45
 While Jefferson County contends that it was prejudiced by EPA's consideration of post-comment documents submitted by PSI, the County had over one year in which to respond to the information submitted to EPA after the comment period. In fact, Jefferson County did respond to this data on August 28, 1981 in its critique of the EPA's proposed determination. Unlike Sierra Club v. Costle where there was no reopening of the formal comment period by EPA, here the Agency conducted two additional comment periods following the allegedly impermissible ex parte contact. 46 Fed.Reg. 15,743 (Mar. 9, 1981); 46 Fed.Reg. 38,937 (July 30, 1981). Jefferson County had ample opportunity to, and actually did, comment on the information accepted by the EPA. The decision-making process was therefore not tainted by the EPA's decision to accept data submitted after the close of the comment period.
 
 
 46
 C. Publication of Three New Criteria.
 
 
 47
 In its announcement of the public hearing on Jefferson County's section 126 petition, the EPA listed eight criteria[12] as being among the issues "that should be addressed by the interested parties and the public." 45 Fed.Reg. 17,048, 17,049-50 (Mar. 17, 1980). However, in the proposed determination of July 30, 1981, the EPA did not refer to the eight criteria published earlier, but instead announced three new criteria[13] "that the Administrator uses in making her determination" on section 126 petitions. 46 Fed.Reg. 38,937, 38,939. Although the proposed determination stated that Jefferson County's petition and submissions addressed each of the three new criteria, Jefferson County argues that it was denied due process because the EPA decision was not based on the eight criteria announced previously.
 
 
 48
 Jefferson County, relying upon Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), asserts that it was denied due process because the introduction of the new criteria interfered with certain "antecedent rights" which apparently arose when the EPA published the eight original criteria. This argument lacks merit.
 
 
 49
 The facts here are readily distinguishable from Greene. The eight criteria published by the EPA did not have the force of a statute, as did the regulation in Greene. Further, the EPA made it clear that the eight criteria here were not exhaustive: "Issues that should be addressed by the interested parties and the public include the ... [eight criteria] given below." 45 Fed.Reg. 17,04 8, 17,049 (Mar. 17, 1980) (emphasis added). Finally, although the EPA published the three new criteria, it also stated that Jefferson County had addressed those criteria. Jefferson County was even invited to submit additional information if it so desired. Moreover, we believe that were we to hold that by suggesting guidelines for submitting information the EPA created irrevocable "antecedent rights," the Agency's ability to collect pertinent information regarding a section 126 petition would be seriously hampered.
 
 
 50
 The limited review authorized by section 7607(d)(9)(D) does not compel reversal here. The procedures employed by the EPA, while not ideal, generally ensured that all parties were given ample opportunity to submit information and to comment on the EPA's determinations. Jefferson County's real quarrel seems to lie with the EPA's substantive determinations.
 
 
 51
 IV. Substantive Issues.
 
 
 52
 In addition to the procedural standard of 42 U.S.C. Sec. 7607(d)(9)(D) discussed above, subsections 7607(d)(9)(A), (B), and (C) provide that the court of appeals may reverse any action of the Administrator which is found to be:
 
 
 53
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;(B) contrary to constitutional right, power, privilege, or immunity;
 
 
 54
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....
 
 
 55
 Jefferson County does not argue, pursuant to subsection (B), that the EPA acted unconstitutionally. It does, however, challenge the EPA's decision as arbitrary or capricious under subparagraph (A) and asserts that, contrary to subparagraph (C), the Administrator exceeded her statutory authority, jurisdiction, or limitations.
 
 
 56
 The "arbitrary or capricious" standard of review is a deferential one which presumes that an agency's actions are valid. E.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Cincinnati Gas & Electric Co. v. EPA, 578 F.2d 660, 663 (6th Cir.1978), cert. denied, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979). Regarding the EPA's decisions, we have observed that "we are required to affirm if there is a rational basis for the agency action and we are not 'empowered to substitute [our] judgment for that of the agency.' " Cleveland Electric Illuminating Co. v. EPA, 572 F.2d 1150, 1161 (6th Cir.) (citing Overton Park ), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978); see also EPA v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980) ("It is by now a commonplace that 'when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.' ") (quoting Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). This view also comports with Train v. Natural Resources Defense Council, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), where the Supreme Court noted that although the Agency's construction was not "the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable that it should have been accepted by the reviewing courts." Id. at 75, 95 S.Ct. at 1480.
 
 
 57
 Thus, our role in reviewing the EPA's determinations is a limited one. If there is a rational basis for the EPA's determination, we must uphold it. Cleveland Electric Illuminating Co. v. EPA, 572 F.2d at 1161; see also National Steel Corp., Great Lakes Division v. Gorsuch, 700 F.2d 314, 321 (6th Cir.1983). At the same time, a reviewing court "does not serve as a mere rubber stamp for agency decisions." Lead Industries Association, Inc. v. EPA, 647 F.2d 1130, 1145 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).
 
 
 58
 Jefferson County challenges the EPA's decision on four grounds. First, the County urges that the factors used by the EPA in its computer modeling studies were incorrect. Second, the County argues that the EPA's decision to deny the petition violates the Clean Air Act requirements of fairness and uniformity in the criteria, procedures and policies applied by regional officers and employees of the EPA. Third, Jefferson County contends that the EPA's decision to deny the section 126 petition violates the Clean Air Act because Gallagher has in effect been permitted to usurp Jefferson County's future margin for growth. Finally, the County argues that the EPA's use of the "substantial contribution" test to determine whether interstate pollution must be abated is improper.
 
 
 59
 A. The Factors Used in the EPA Modeling Studies.
 
 
 60
 Jefferson County disputes several of the factors used by the EPA in the revised modeling study: (a) the stack base elevation and stack height, (b) the 24-hour background concentration of SO2 , (c) the receptor grid spacing, (d) the choice of meteorological data, and (e) the stack exit gas velocity.
 
 
 61
 Upon the record provided, we conclude that the EPA had a rational basis for choosing each of the factors.
 
 
 62
 Jefferson County asserts that the stack base elevation and stack height used by the EPA (460 and 1010 feet, respectively, rather than 410 and 960 feet) are too high. We cannot very well go to the site, take measurements ourselves, and decide who is in fact right. The EPA's choice of the higher figures was based on a certified survey performed specifically for the Gallagher site. We accept the rationality of this choice.
 
 
 63
 Jefferson County also argues that the 24-hour background concentration of SO2 used in the EPA modeling is too low (17 ug/m[3] rather than 37 ug/m[3]). However, EPA presents a rational basis for its use of the lower figure. According to the Agency, the lower background concentration is "consistent with regional background concentrations as recommended in EPA's monitoring guidelines." Further, the EPA identified 215 sources of SO2 in Jefferson County, individually modeled the significant producers of SO2 , such as the Louisville Gas and Electric power plants, and accounted for other area sources by calculating them into the background concentrations.
 
 
 64
 Another objection raised by the County is that EPA should have used meteorological data from 1973 through 1979, rather than data from 1973 through 1977 only. However, EPA states that when the original and revised modeling was performed, the more recent meteorological data was not available. Jefferson County further objects to the EPA's use of a relatively coarse receptor grid, with receptors spaced two kilometers apart, rather than 250 meters apart as the County urged. Again, the EPA had a rational basis for its choice. According to the Agency, it used the coarse receptor grid to screen the area. Where SO2 concentrations were relatively low, and there was a steady trend of diminishing SO2 impacts, no further modeling was done. Where SO2 concentrations exceeded the NAAQSs, or SO2 impacts were uncertain, a more refined grid of 100 meters was used to accurately determine SO2 concentrations. We are unable to fault such a procedure as irrational.
 
 
 65
 The EPA has presented an additional reason why Jefferson County's objections to the criteria used in the modeling are not well taken: the same results would have obtained even if Jefferson County's criteria were used. EPA did a supplementary modeling using the four factors urged by Jefferson County and found that the results were essentially unchanged.
 
 
 66
 In addition to the four factors already discussed, Jefferson County objected to the stack exit gas velocity used by EPA in its modeling (40 meters per second rather than 20 meters per second). The EPA did not run a supplementary modeling using the County's lower velocity figure, because the exit gas velocity used was based on the velocity reported by PSI to the Federal Energy Regulatory Commission. This velocity was consistent with the velocity actually measured by the EPA in a stack test performed in 1975.
 
 
 67
 It is apparent that the EPA had a rational basis for each of the factors it used in the modeling study. The EPA's willingness to consider the figures submitted by Jefferson County was demonstrated by the Agency's running an additional modeling study using four of the five factors suggested by the County. Thus, the EPA's choice of modeling factors was neither arbitrary nor capricious.
 
 
 68
 B. Fairness and Uniformity in Criteria: Section 7601(a)(2)(A).
 
 
 69
 Jefferson County argues that the EPA denied the section 126 petition without considering the "interstate inequities" that the interstate pollution provisions were designated to eliminate. One aspect of this argument concerns 42 U.S.C. Sec. 7601(a)(2)(A) which states:
 
 
 70
 (2) Not later than one year after August 7, 1977, the Administrator shall promulgate regulations establishing general applicable procedures and policies for regional officers and employees (including the Regional Administrator) to follow in carrying out a delegation under paragraph (1), if any such regulations shall be designed(A) to assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the chapter....
 
 
 71
 Although its argument is rather vague, the County apparently reads section 7601(a)(2)(A) as providing specific protections against "interstate inequities." In the County's view, inequities arise in the present case because the EPA has approved SO2 emission limitations for Gallagher that are very different from the limitations set for Kentucky sources. According to Jefferson County, this disparity is inequitable and therefore violates the protections afforded by section 7601(a)(2)(A).
 
 
 72
 However, we are unable to agree that section 7601(a)(2)(A) can be so applied. Section 7601 generally relates to administration and the procedures to be followed by EPA employees in carrying out a delegation of authority from the Administrator. There is simply no indication in the statute that section 7601(a)(2)(A) establishes a substantive standard which requires similar or uniform emission limitations for all sources within a particular area as part of a section 126 determination. Such a reading of section 7601(a)(2)(A) is contrary to the federalist approach of the Clean Air Act: the Administrator is required to approve the emission limitations proposed by any state, so long as the requirements of section 7410(a)(2) are met, regardless of non-uniformity among the states. See Train v. Natural Resources Defense Council, 421 U.S. 60, 65-66, 95 S.Ct. 1470, 1475, 43 L.Ed.2d 731 (1975).
 
 
 73
 Moreover, the plain language of section 7601(a)(2)(A) does not support Jefferson County's reading. The statute refers to "regulations establishing general applicable procedures and policies for regional officers and employees" which "assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions." 42 U.S.C. Sec. 7601(a)(2)(A). Section 7601 deals with uniformity and fairness in the procedures and policies followed by EPA employees, not uniformity in SIP emission standards. The title of the section is "Administration"; nothing in the language of the statute indicates that it is also a substantive provision mandating uniform regional emission standards.[14] Unlike sections 7426 and 7410(a)(2)(E), which are cross-referenced and deal specifically with interstate emissions, section 7601 does not mention emission limitations and is not referred to by the sections of the Act that do pertain to such matters.
 
 
 74
 Consequently, Jefferson County's argument in this regard is not well taken.
 
 
 75
 C. The "Margin For Growth" Argument.
 
 
 76
 Jefferson County asserts that Kentucky's SIP was designed to create a margin of clean air in Jefferson County by setting stringent emission standards that would leave the air cleaner than the NAAQSs require. Creation of this margin of clean air would allow further industrial growth in Jefferson County without the NAAQSs being violated. Since the operation of Gallagher without controls could in certain parts of Jefferson County contribute 47% of the secondary NAAQS for SO2 ,[15] the County contends that the margin for growth contemplated by the Kentucky SIP has been stolen by Gallagher to the economic disadvantage of Jefferson County. The County also seems to contend that once it attains the secondary NAAQS for SO2 , Gallagher's emissions will interfere with future measures to prevent significant deterioration of air quality in Jefferson County. Presently, no such measures are in place, since the County has not achieved the NAAQSs for SO2 .
 
 
 77
 The EPA's response to this "margin for growth" argument was seemingly inconsistent. Initially, in its notice of the proceedings on Jefferson County's section 126 petition, the EPA interpreted the interstate pollution abatement provisions as prohibiting interference with another state's margin for growth:
 
 
 78
 The Agency considers that the degree of protection afforded by the interstate pollution provisions includes not only protection against NAAQS violations, but also protection against unreasonable interference with a maintenance program or margin for growth in the SIP. In reaching this conclusion, the Agency has reviewed the interstate pollution provisions of the Act, including Sections 101, 110, 126 and 301, their legislative history and pertinent case law. The Agency is of the opinion that these provisions evidence Congressional intent to protect against unreasonable interstate interference with State programs to maintain the NAAQS and create margins of growth, as well as efforts to attain the standards, prevent significant deterioration of air quality and protect visibility. Such efforts may include State adoption of emission limitations that are more stringent than needed to attain Federal standards. In addition, the Agency believes that the provisions are designed to protect against interstate interference with State or local ambient air standards or other measures more stringent than necessary to attain Federal standards. See, H.R.Rep. No. 93-294, 95th Cong., 1st Sess., May 12, 1977, 331, n. 14, U.S.Code Cong. & Admin.News 1977, p. 1077.
 
 
 79
 45 Fed.Reg. 17,048, 17,049 (Mar. 17, 1980). The EPA also solicited comments from interested parties on whether Gallagher has "a substantial adverse impact on Kentucky's or Jefferson County's efforts to develop a State Implementation Plan which will attain and maintain standards or create a margin for future growth for NAAQS or PSD purposes."[16] Id. (emphasis added). Thus, at the outset, the EPA suggested that the Clean Air Act permits states to reserve to themselves a margin for growth.
 
 
 80
 However, when the EPA rendered its final determination on Jefferson County's section 126 petition, the "margin for growth" argument was rejected. In referring to the problem of Gallagher consuming Jefferson County's future PSD increment, the EPA stated:
 
 
 81
 Comment. One commentator objected to EPA's proposed finding that emissions from Gallagher do not interfere with PSD provisions and urged the Administrator to make a finding on the plant's potential impact on future PSD requirements in Jefferson County.
 
 
 82
 Response. Jefferson County is a nonattainment area for SO2 , and the PSD regulations are not applicable. Consequently the Gallagher plant cannot interfere at this time with PSD requirements in Jefferson County. Section 126 only prohibits interference with PSD measures required by the Clean Air Act, and therefore EPA need not review possible future impacts on regulations not yet in place. "See State of Connecticut v. EPA," 656 F.2d 902 [2d Cir.1981]. Furthermore, Gallagher's emissions will not consume any future PSD increment since its emissions at the time the baseline date is set will be included in the baseline air quality in Jefferson County.
 
 
 83
 47 Fed.Reg. 6624, 6627 (Feb. 16, 1982).
 
 
 84
 Jefferson County argues that this apparent turnabout violates the County's right to due process. While we have already concluded that the County's procedural due process rights were not violated, there yet remains a second question: did the EPA act arbitrarily or capriciously in ultimately rejecting the "margin for growth" argument, especially after having initially stated in the notice of hearing on Jefferson County's petition that the interstate pollution provisions protect against interference with margins for growth? Clearly, the EPA's final position on the "margin for growth" issue was markedly different from that first taken in the notice of hearing. However, for several reasons, we are disinclined to hold that it was improper for the EPA to reconsider and revise its initial assessment of the protections which the Clean Air Act affords to state efforts to maintain a margin for growth.
 
 
 85
 In our view a notice of hearing simply is not, and should not be treated as, a vehicle for final agency pronouncements on sophisticated matters of statutory interpretation. As we observed earlier regarding the eight criteria listed in the notice of hearing, the EPA, by suggesting guidelines and apprising the parties of its preliminary views of the issues, does not irrevocably commit itself to a particular position. To so bind the EPA would hinder the Agency's ability to solicit comments and information. Unlike a final agency determination, which is the product of careful consideration of all the evidence, a notice of hearing is necessarily issued without input, and consequently it would be inappropriate to treat it as though it were an irrevocable pronouncement or rule. There is great value in encouraging candor in the framing of notices, inasmuch as this assists the parties in preparing for the hearing.
 
 
 86
 Obviously, the Agency should not mislead and thereby prejudice the parties by adopting one position in the notice of hearing and then shifting to another interpretation in the final determination. Here, though, the County offered extensive evidence that Gallagher's emissions would interfere with the margin for growth that Jefferson County sought to establish; it does not point to any examples of evidence that might otherwise have been brought to the EPA's attention. Thus, while the change in EPA's position undoubtedly disappointed Jefferson County, there is no indication that the County was prejudiced thereby.
 
 
 87
 Finally, we are convinced that the EPA should not be bound by its initial assessment of the "margin for growth" issue, because the agency should have the opportunity to alter its position in order to take into account current decisions by the judiciary. In this case, after the EPA published its notice of hearing on March 17, 1980, the Second Circuit published its decision in Connecticut v. United States Environmental Protection Agency, 656 F.2d 902 (2d Cir.1981). Although the Second Circuit did not expressly state that the Clean Air Act does not prohibit interference with margins for growth, the opinion contains language from which this could be readily inferred. Id. at 909-10. The EPA cited this case in its final determination as supporting its decision to reject Jefferson County's "margin for growth" argument.
 
 
 88
 It having been concluded that the EPA did not act arbitrarily or capriciously in altering its position on the "margin for growth" issue, the question remains whether the EPA committed substantive error in deciding that the interstate pollution abatement provisions of the Act do not protect margins for growth.
 
 
 89
 A reviewing court may reverse an action of the Administrator which is arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, or short of statutory right. 42 U.S.C. Sec. 7607(d)(9)(A) and (C). We are mindful that our inquiry is not whether the Agency's construction of the Act is "the only one it could have adopted," but whether the Agency's action is reasonable. Train v. Natural Resources Defense Council, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). We conclude that it is.
 
 
 90
 The EPA contends that it is irrelevant to the petition brought by Jefferson County under section 126 whether Gallagher infringes on the margin for growth which the County asserts it needs for future industrial development. By utilizing section 126 to prevent upwind states from contributing SO2 to air that is cleaner than the NAAQSs require, the County is in effect attempting to establish a local air quality standard that is more stringent than the national standard. The EPA argues that the literal language of sections 126(b) and 110(a)(2)(E), 42 U.S.C. Secs. 7426(b), 7410(a)(2)(E), indicates that interstate pollution is prohibited only insofar as it prevents another state from attaining or maintaining "any such national primary or secondary ambient air quality standard." 42 U.S.C. Sec. 7410(a)(2)(E)(i) (emphasis added). Thus, in the EPA's view, the interstate pollution abatement provisions only protect against interference with national air quality standards, not with a margin for growth or any other "individually tailored" standard.
 
 
 91
 This argument derives support from the decision of the Second Circuit in Connecticut v. United States Environmental Protection Agency, 656 F.2d 902 (2d Cir.1981). In that decision the court held that section 110(a)(2)(E)(i), 42 U.S.C. Sec. 7410(a)(2)(E)(i), does not require a state to
 
 
 92
 respect its neighbor's air quality standards (or design its SIP to avoid interference therewith) if these standards are more stringent than the requirements of federal law. Indeed, Sec. 110(a)(2)(E) appears to have been carefully drafted to preclude any such interpretation .... The clear intent of the statute is to require interstate comity only insofar as is necessary to allow each state to comply with the NAAQS and the Act's PSD provisions.
 
 
 93
 656 F.2d at 909. Because of the statute's plain, unambiguous language, the court found it unnecessary to investigate the legislative history of section 110. Id.
 
 
 94
 Upon consideration of the statute and the relevant case law, we cannot say that the EPA's determination that the Act does not protect future margins for growth is unreasonable. Since Jefferson County has yet to achieve the NAAQSs for SO2 , any "interference" by Gallagher with the asserted margin for growth is necessarily conjectural. Also, the literal language of 42 U.S.C. Sec. 7410(a)(2)(E) supports the EPA's interpretation. Moreover, the EPA can hardly be faulted for relying on the reasoning advanced by the Second Circuit in Connecticut v. United States Environmental Protection Agency. We believe that the need for national uniformity in judicial interpretation of the Act is particularly important where, as here, the relationships between the states are at issue. Thus, we decline to disturb the EPA's holding that the Clean Air Act does not require an upwind state to alter an otherwise valid SIP solely because a downwind state that has yet to comply with the NAAQSs has requested such an alteration to protect an asserted margin for growth.
 
 
 95
 D. The "Substantial Contribution" Test.
 
 
 96
 A major objective of the Clean Air Act Amendments of 1977 was to deal with the problem of interstate air pollution, which Congress believed had been inadequately addressed by the 1970 Act.[17] Congress amended section 110 of the 1970 Act to require the Administrator, before approving any SIP or portion thereof, to determine that it contains
 
 
 97
 adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility ....
 
 
 98
 42 U.S.C. Sec. 7410(a)(2)(E). Section 126, 42 U.S.C. Sec. 7426, also added by the 1977 amendments, requires states in developing implementation plans to identify existing and proposed sources of pollution that may significantly affect the air quality of neighboring states and to provide notice of this information to the states.[18] Section 126 further provides that neighboring states may petition the Administrator for a finding that a major source emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(E)(i). The question which has plagued the EPA and reviewing courts since that time is, assuming that no upwind state can transmit utterly pure air to its neighbor, how much pollution is too much under the Act?
 
 
 99
 If the 1977 amendments to the Act have in fact added to the interstate pollution abatement authority of the EPA, and to the ability of states to seek relief from interstate air pollution, the Act has done little to provide guidelines for the equitable allocation of the burden of reducing interstate pollution. The problem is far more complex than it may at first seem and does not consist solely, or perhaps even primarily, of limiting the emissions of upwind stationary sources. The intractable nature of the problem is well described in a law review Comment:
 
 
 100
 Interstate equity requires that the burden of reducing interstate pollution be allocated fairly among the states involved. Some of the factors that must be considered in defining interstate equity are whether existing or new sources are involved, whether the source state's SIP contains stringent or lax emission standards, whether emission standards are being violated in the source state, the extent to which sources in the receiving state contribute to NAAQS non-attainment there, and whether the contributions by sources in the receiving states are due to violations of emissions standards or to lax standards. The number of factors to be considered and their complex interactions demonstrate that no simple definition of interstate equity is likely to be satisfactory.
 
 
 101
 If interstate pollution would arise with respect to a proposed new source, EPA can simply prevent construction of that source. Recently EPA issued an interim policy for new sources that allows each state to consume only half of the increment that exists at the state line. This interim policy is an initial step toward defining interstate equity, but it involves only the relatively easy case of sources that have not yet been constructed.
 
 
 102
 Achieving interstate equity when interstate pollution is emitted by existing sources presents a greater problem. Usually non-attainment in the receiving state will be due to emissions from sources inside that state, in addition to the interstate pollution. If both states have SIP's adequate to attain the NAAQS's, and the non-attainment is because of SIP violations in the source state or both states, then SIP enforcement is all that is necessary. But if all sources in the interstate area are in compliance with their states' emission standards, the issue becomes more complex especially if one state's emission standards are more lenient than the other's.
 
 
 103
 Perhaps interstate equity requires each state's emission standards to be identical for like sources. However, such a definition would not necessarily apportion the abatement burden equitably in an interstate region if one state has larger, more numerous, or different types of contributing sources than the others. Alternatively, interstate equity may require that economic impacts for each state be the same. If so, further problems arise in measuring the economic impact in each state, and in allocating that impact within each state.
 
 
 104
 Silverstein, Interstate Air Pollution: Unresolved Issues, 3 Harv.Envtl.L.Rev. 292-93 (1979) (citations omitted).
 
 
 105
 Perhaps the most hotly debated issue in these proceedings is the standard to be applied by the Administrator in interpreting 42 U.S.C. Sec. 7410(a)(2)(E)(i).[19] This section establishes the circumstances under which the interstate pollution abatement provisions of the Clean Air Act are triggered: interstate pollution is forbidden if it will "prevent attainment or maintenance" of the NAAQSs. Under the broad interpretation of section 7410 urged by Jefferson County, the Act would prohibit nearly all interstate pollution. On the other hand, a narrow reading of the same section would allow only the most extreme instances of interstate pollution to come under scrutiny.
 
 
 106
 When it denied Jefferson County's petition, EPA interpreted the "prevent attainment or maintenance" language of section 7410 to mean that an interstate polluter, here Gallagher, must "cause or substantially contribute" to a violation of a NAAQS in another state before the pollution abatement provisions are triggered. 47 Fed.Reg. 6624, 6628 (Feb. 18, 1982). According to this interpretation, a section 126 petition may not be granted unless there is (a) a violation of the NAAQSs in one state and (b) pollution emissions in another state which substantially contribute to the violation. Jefferson County particularly objects to the use of the term "substantial contribution," describing it as "an unduly restrictive approach" which fails to consider the equitable elements of the Clean Air Act.
 
 
 107
 Essentially, Jefferson County's objection concerns the meaning of the word "prevent" in section 7410(a)(2)(E)(i).[20] Since the Clean Air Act itself offers no guidance as to what levels of pollution "prevent attainment and maintenance" of the NAAQSs, this language is open to differing interpretations.[21] The County disagrees with the EPA's conclusion that, since only about three percent of the pollutants in areas which violate the SO2 NAAQSs in Kentucky are attributable to Gallagher, the plant does not "prevent attainment or maintenance" of the NAAQSs in Jefferson County. The County asserts that in effect the EPA has amended section 126 of the Act by adding a requirement that there be a showing that a polluting state "substantially contributes" to a violation of the NAAQSs in the downwind state before a section 126 petition can be granted. The County urges an approach whereby any contribution by a polluting state to a NAAQS violation in a receiving state would be forbidden under section 126: "If the sending state contributes 100% to a problem, then it will be required to contribute 100% of the solution. If the contribution is 1%, then the solution is 1% and any amounts in between."
 
 
 108
 Prior to 1977, the Clean Air Act's interstate pollution provisions primarily required that SIPs contain adequate provisions for intergovernmental cooperation. The Administrator was to implement this requirement by enacting a regulation calling "for an exchange of information among States on factors which may significantly affect air quality in any other State." H.R.REP. No. 294, 95 Cong., 1st Sess. 329, reprinted in 1977 U.S.CODE CONG. & AD.NEWS 1077, 1408. Although some voluntary compliance and cooperation was achieved under the former version of the Act, Congress clearly found the earlier provisions "an inadequate answer to the problem of interstate air pollution." Id. at 330, U.S.CODE CONG. & AD.NEWS at 1409. Amended section 110 and new section 126 were intended "to establish an effective mechanism for prevention, control, and abatement of interstate air pollution." Id.
 
 
 109
 We believe from the cited legislative history that Congress intended that the two sections be applied in concert to provide a more effective remedy for interstate pollution.
 
 
 110
 The Second Circuit, in Connecticut v. EPA, 696 F.2d 147 (2d Cir.1982), recognized the difficulty of formulating any simple test for determining when the remedial powers of the EPA are triggered. In that case the court considered an EPA ruling which appeared to impose a "significant contribution" test in determining whether a revision of a SIP "prevents attainment" of the NAAQSs under section 7410(a)(2)(E):
 
 
 111
 In addition, we agree with EPA that these minimal impacts will not "prevent [Connecticut's] attainment" of the NAAQSs for TSP in contravention of Sec. 7410(a)(2)(E)(i)(I). The legislative history is again unclear as to the precise meaning of "prevent the attainment" in situations where the affected state has not yet complied with the NAAQSs. See H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 145-46, reprinted in 1977 U.S.Code Cong. & Ad.News at 1526-27; H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-31, reprinted in 1977 U.S.Code Cong. & Ad.News at 1408-10. The Agency suggests that the words of the statute indicate a congressional desire to prohibit revisions to state implementation plans which will "significantly contribute" to already existing violations in other states. The problem with this interpretation, however, is that the statute contains no guidelines as to what would constitute a "significant contribution." Moreover, the 1977 Clean Air Act Amendments unmistakably indicate a strong congressional policy to strengthen the procedure for bringing each state to compliance with the national standards. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 1, reprinted in 1977 U.S.Code Cong. & Ad.News at 1079; see also National Resources Defense Council v. Gorsuch, 685 F.2d 718 (D.C.Cir.1982). We must tread lightly, therefore, in approving any interpretation of the Clean Air Act which might interfere with the statutory goal of ensuring that each state comply with the NAAQSs as "expeditiously as practicable". See Sec. 7502.
 
 
 112
 Id. at 164 (footnote omitted). The Second Circuit was not convinced by Connecticut's argument, similar to that offered by Jefferson County here, that one state cannot "spill" any pollution into another state so long as the downwind state has not yet attained the NAAQSs:
 
 
 113
 On the other hand, nothing in the legislative history indicates that Sec. 7410(a)(2)(E)(i)(I) was intended to prevent even minimal impacts upon another state's pollution concentrations simply because that state has not attained the national standards. To adopt this approach would be to hold one state hostage to another's failure to enact the pollution control strategies necessary to conform to the requirements of the Clean Air Act. Moreover, as intervenor LILCO points out, the language of Sec. 7410(a)(2)(E)(i)(I) seems to contemplate a standard which would prohibit SIP revisions only if the emissions they permit would in and of themselves prevent a nearby state from attaining the NAAQSs. Accordingly, we cannot reject the Agency's interpretation of the statute in favor of a blanket rule forbidding the EPA from approving any SIP revision which permits additional amounts of a specific pollutant to be added to concentrations in a nearby state which has not attained the NAAQSs.
 
 
 114
 Id. (footnote omitted). The Second Circuit further concluded that it need not, under those facts, define the threshold standard for triggering the abatement provisions of the Act:
 
 
 115
 At the same time, the facts of this case do not require us to conclusively adopt the Agency's suggestion that Sec. 7410(a)(2)(E)(i)(I) prohibits only those SIP revisions which will "significantly contribute" to pollution concentrations in the affected state. We hold only that where the impact upon a nearby state of another state's revision of its SIP is shown by the Agency to be so insignificant as to be fairly described as minimal, the EPA may approve that revision even where the affected state is not in compliance with the NAAQSs. See Alabama Power Co. v. Costle, 636 F.2d 323, 360-61 (D.C.Cir.1979). Here the estimated maximum impact of 2.06 ug/m[3] is less than 1.5% of even the secondary NAAQS. Because this impact is truly minimal, we conclude that the EPA did not violate Sec. 7410(a)(2)(E)(i)(I) when it determined that LILCO's direct particulate emissions would not "prevent the attainment" of the NAAQSs for TSP in Connecticut.
 
 
 116
 Id. at 164-65. We do not read this decision as establishing a "minimal impact" standard. The opinion merely indicates that the Second Circuit will not disturb an agency finding concerning interstate pollution when the court concludes from its own examination that the effect is "truly minimal." The problem faced by the EPA in this case, and now by this court on appeal, is the same one that the Second Circuit faced: the statute contains no guidelines as to what level of interstate air pollution is sufficient to trigger the abatement procedures of the Act. The Second Circuit avoided adopting a "significant contribution" rule because it concluded that under the facts before it, the interstate pollution present had at most a "minimal" impact. One difficulty with such an observation is that courts generally do not possess the technical knowledge necessary for making these determinations. Thus, we believe it was brave for the Second Circuit to hold that the impact of the interstate pollution was "truly minimal." At the same time, there was little else that the court could do but try to evaluate the technical data, while necessarily relying heavily on the expertise of the EPA.
 
 
 117
 Our difficulty in this case is similar, but perhaps even more pronounced because we are not dealing with a level of interstate emissions as low as that which the Second Circuit found to be "minimal."[22] Thus, although it might seem desirable for us to follow the same course as the Second Circuit, we believe that given the judiciary's general lack of expertise in the area of interstate pollution regulation, we could characterize Gallagher's emissions as "minimal" only at our peril. Consequently, we must consider the problem of what standard the EPA may permissibly use in interpreting the "prevent attainment or maintenance" language of 42 U.S.C. Sec. 7410(a)(2)(E). Specifically, we must decide whether the Act does set forth any particular threshold for Agency intervention and, if so, how that threshold is properly described.
 
 
 118
 Upon examining the language of the Clean Air Act, we believe that the test probably intended by Congress is whether one state "significantly contributes" to NAAQS violations in another state. Although this test is not specifically incorporated into the statute, we do find reference to the phrase in section 126(a), 42 U.S.C. Sec. 7426(a), of the Act, which requires written notice to nearby states of interstate pollution. This new section of the Act provides that all nearby states are entitled to notice of any proposed new or modified source of pollution "which may significantly contribute to levels of air pollution in excess of the national ambient air quality standards in any air quality control region outside the state in which such source intends to locate (or makes such modifications)." Id. (emphasis added). Since the purpose of written notice is to enable affected states to take action, it seems logical to infer that in enacting section 126, Congress intended to prohibit interstate pollution which does or will "significantly contribute to levels of air pollution in excess of the national air quality standards." We do not believe that Congress intended to prohibit even de minimis contributions by one state to NAAQS violations in another state because such a policy would in effect "hold one state hostage to another's failure to enact the pollution control strategies necessary to conform to the requirements of the Clean Air Act." Connecticut v. EPA, 696 F.2d 147, 164 (2d Cir.1982).
 
 
 119
 Having concluded that the proper test to be applied in evaluating the section 126 petition is whether Gallagher's emissions "significantly contribute" to NAAQS violations in Jefferson County, we must ascertain whether the EPA was correct in its determination that Gallagher's emissions are permissible. The EPA performed extensive modeling studies of the effect of Gallagher's emissions and found that Gallagher contributed only about three percent of the pollutants in areas of Jefferson County that violate the NAAQSs. The EPA determined that Gallagher does not "substantially contribute" to NAAQS violations in Jefferson County and that consequently, section 126 does not require pollution abatement. For the purposes of this opinion, we decline to delve into the semantic distinctions between "substantial" and "significant" and choose to treat the terms as having the same meaning. We are convinced that the broad deference which we are statutorily required to accord to the findings of the Agency preclude our disturbing the EPA's determination, at least absent any other criteria established by the EPA, or found elsewhere in the Act, that would require a different result.[23] Jefferson County points to the fact that, although Gallagher may contribute only three percent to actual NAAQS violations, Gallagher contributes a substantially greater percentage of the pollutants present in parts of the County where the NAAQSs are not violated. However, 42 U.S.C. Sec. 7410(a)(2)(E) appears to contemplate interstate pollution abatement actions only where interstate emissions prevent attainment of the NAAQSs, i.e., only where the standards are violated. Thus, we believe that the EPA did not err in denying Jefferson County's section 126 petition.
 
 
 120
 V. Conclusion.
 
 
 121
 In a most practical sense, Jefferson County's concerns are understandable. There would appear to be a patent unfairness in an Agency policy which would tolerate so much higher a level of SO2 emissions in one area than in another, especially given the high costs which Jefferson County has already incurred to reduce its own pollution. Nevertheless, we believe that the construction placed upon the statute by the EPA appears to be literally correct, even though arguably at odds with the important policy values represented by the 1977 amendments. This conclusion, and our strong preference to achieve an interpretation of the Act which is consistent among the several circuits, compels us to agree with the Agency here.
 
 
 122
 It may be that the problem of interstate air pollution abatement requires an effective regional regulative scheme rather than the present unsatisfying reliance upon state boundaries as the basic unit for pollution control. See 1 Grad, Treatise on Environmental Law Sec. 2.05 (1984) ("The problem of enforcement across jurisdictional lines remains a difficult issue even after the enactment of section 126 in 1977, because each state or locality can only deal with its own emissions, though it may be the fallout from the other state's emissions in the same region that cause the major problem." Id. at 2-414.); see also Silverstein, Interstate Air Pollution: Unresolved Issues, 3 Harv.Envtl.L.Rev. 291 (1979). However, we have neither the legislative authority to amend the statute nor the regulatory and technical expertise to set more specific technical standards. As long as the statute mandates that implementation plans be created and reviewed on the basis of state boundaries, there will be differences between the emission limitations imposed by neighboring states. No nationwide emission limitations appear to have been intended by Congress, and therefore, while we have considerable sympathy for the position of Jefferson County here, we conclude that we do not possess the statutory authority or regulatory expertise to grant any relief.
 
 
 123
 The petition for review of the Agency's final determination to deny Jefferson County's section 126 petition is denied.
 
 
 
 [1]
 42 U.S.C. Sec. 7410(a)(2)(E) (Supp. V 1981) provides:
 (2) The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan, or any portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that--
 * * *
 (E) it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement ....
 
 
 [2]
 Unless otherwise indicated, all United States Code citations refer to Supplement V, 1981
 
 
 [3]
 National primary air quality standards are designed to protect the public health. 42 U.S.C. Sec. 7409(b)(1). National secondary air quality standards seek to protect the public welfare from "any known or anticipated adverse effects" associated with air pollutants. 42 U.S.C. Sec. 7409(b)(2)
 
 
 [4]
 Since many states have been unable to meet the NAAQSs, Congress has extended the deadlines for compliance. Connecticut Fund for the Environment v. EPA, 696 F.2d 169, 172 n. 3 (2d Cir.1982)
 
 
 [5]
 Interstate air quality control regions were established to deal with air pollution problems of an interstate nature. H.R.Rep. No. 1146, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 5356, 5357. While the proximity of population centers to state boundaries naturally suggests the need for such regions, little attention is given in the statutory scheme to their potential usefulness
 
 
 [6]
 In a modeling study, computers use actual data regarding stack emissions, plant operations, and meteorological conditions to predict the concentrations of various pollutants at points within a given area. See Cleveland Electric Illuminating Co. v. EPA, 572 F.2d 1150, 1160 (6th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978)
 
 
 [7]
 The criteria are as follows:
 (1) a demonstration establishing the existence and geographic boundaries of the nonattainment or PSD area which is the subject of the petition; (2) a demonstration that achievement of ambient air quality standards, or of measures necessary to prevent significant deterioration or to protect visibility, is prevented by the named out-of-state sources; and (3) indications that sources within the petitioning states which impact on the PSD and nonattainment areas have been adequately controlled.
 
 
 [46]
 Fed.Reg. 38,937, 38,939 (July 30, 1981)
 
 
 [8]
 Jefferson County challenged the following factors: (1) the stack base elevation and stack height of the Gallagher plant, (2) the background concentration of SO2 used by the EPA to determine the 24-hour standard, (3) the meteorological data used by EPA, (4) the receptor grid spacing (Jefferson County would have spaced the receptors more densely), and (5) the stack exit gas velocity which the EPA used (a higher velocity results in greater diffusion of pollutants)
 
 
 [9]
 The EPA questioned the accuracy of Jefferson County's estimate of the stack gas velocity. According to the Agency, the gas exit velocity used by Jefferson County in its modeling study was about one-half of the rate which the EPA had determined the exit velocity to be in a stack test performed in 1975. 47 Fed.Reg. 6627 (Feb. 16, 1982)
 10 U.S. Environmental Protection Agency, An Analysis of the Impact Upon Air Quality in Louisville, Kentucky from Gallagher Steam Plant, VI-19 (1979).
 This report indicates that the "highest second-highest" concentration, rather than the maximum, was used to judge compliance with the standard because this is the procedure recommended in the EPA's Guideline on Air Quality Models (EPA-450/2-78-027). The "second-highest" concentration is relevant because under the regulations promulgated by the EPA, the primary and secondary NAAQSs for SO2 may be exceeded once annually without a violation resulting thereby. 40 C.F.R. Secs. 50.4-.5 (1983).
 
 
 [11]
 Although Gallagher contributes pollutants to Jefferson County, evidently its emissions impact most heavily on parts of the County that are not in violation of the NAAQSs for SO2 . Consequently, the EPA concluded that Gallagher does not substantially contribute to a violation of the SO2 NAAQSs
 
 
 [12]
 1. Does the Gallagher Power Plant in Indiana now cause or contribute to air pollution concentrations in excess of the NAAQS in Kentucky?
 
 
 [2]
 Were sources in Jefferson County, Kentucky, required to put on additional controls to correct NAAQS violations that were caused or substantially contributed to by emissions from the Gallagher plant?
 
 
 [3]
 Does the Gallagher plant have a substantial adverse impact on Kentucky's or Jefferson County's efforts to develop a State Implementation Plan which will attain and maintain standards or create a margin for future growth for NAAQS or PSD purposes? It should be noted that emissions from the Gallagher Plant may affect future growth in Kentucky, irrespective of a proposed new sources [sic] and Gallagher's air quality impact within Kentucky, if Gallagher substantially consumes the full NAAQS or PSD increment within Indiana
 
 
 [4]
 The Agency currently intends to encourage the interested parties to resolve the interstate dispute themselves. The Agency will encourage the parties to consider various strategies and tradeoffs that may be used to settle the dispute. If this is not possible, the Agency intends to make a case-by-case finding of whether an interstate pollution problem exists. The Agency will consider the air quality impact of the source and differences between the control requirements for the contested source and comparable sources in the affected State. One option would be to find that the Gallagher plant in Indiana has a substantial adverse impact on Kentucky's air quality maintenance program or margin for growth if, in the Administrator's opinion, the air quality impact in Kentucky of emissions from the Gallagher plant is significantly greater than the air quality impact allowed a comparable Kentucky source
 
 
 [5]
 If the Agency makes a finding of substantial adverse impact, the Agency may resolve the interstate dispute by requiring generally comparable emission limits for comparable sources in both States. In determining a comparable emission limit for the contested source, the Administrator would consider the air quality impacts permitted comparable sources in each State and emission limits required for similar sources in similar areas. Comments are solicited on such an approach
 
 
 [6]
 Suggestions are also solicited on other appropriate criteria for USEPA arbitration of interstate disputes. Suggestions should include consideration of the following questions:
 a. How should differences between State emission limits generally be compared against the estimated air quality impacts of out-of State sources and comparable in-State sources.
 b. What criteria should the Agency utilize when air quality impacts may be difficult to ascertain, for example, when multiple sources and pollution transport over considerable distances may be involved?
 c. In such a situation, should the Agency give a lesser weight to air quality impacts and more to differences in emission limits?
 d. Under what circumstances should the Agency consider the application of reasonably available control technology (RACT) by the contested sources to be sufficient in and of itself to avoid a finding of impermissible interstate pollution?
 e. Under what circumstances should the Agency require regionally uniform emission limits or uniform control technologies?
 
 
 [7]
 Specific discussions of estimated air quality impacts should include information on, among other things, the model used, the input data used, and the assumptions used in applying the model, such as the selection of critical meteorological periods, plant loading and other plant operating characteristics assumed for the period of time (annual, 24-hour, 3-hour, 3-hour [sic] being examined and fuel variability
 
 
 [8]
 If the Agency has need of more information than that presented at the hearing, it may use its powers to obtain information under Section 114 of the Act. Also, if any additional reports or studies need to be prepared, the costs of such may be assessed against the Agency's Section 105 grants for the States involved in the dispute. The Agency may require in-stack monitoring to develop comparable information
 
 
 [45]
 Fed.Reg. 17,048, 17,049-50 (Mar. 17, 1980)
 
 
 [13]
 See supra note 7
 
 
 [14]
 The official regulations found at 40 C.F.R. Sec. 56.1-.6 (1982), which implement the provisions of section 7601(a)(2)(A), are strictly administrative in nature. There is no mention made of uniform emission limitations
 
 
 [15]
 See supra note 11
 
 
 [16]
 See criterion number three, supra note 12
 
 
 [17]
 The Clean Air Act prior to the 1977 amendments was deemed by Congress "an inadequate answer to the problem of interstate air pollution." H.R.Rep. No. 294, 95th Cong., 1st Sess. 330, reprinted in 1977 U.S.Code Cong. & Ad.News 1077, 1409
 
 
 [18]
 42 U.S.C. Sec. 7426 states in part:
 (a) Written notice to all nearby States
 Each applicable implementation plan shall--
 (1) require each major proposed new (or modified) source--
 (A) subject to part C (relating to significant deterioration of air quality) or
 (B) which may significantly contribute to levels of air pollution in excess of the national ambient air quality standards in any air quality control region outside the State in which such source intends to locate (or make such modification),
 to provide written notice to all nearby States the air pollution levels of which may be affected by such source at least sixty days prior to the date on which commencement of construction is to be permitted by the State providing notice, and
 (2) identify all major existing stationary sources which may have the impact described in paragraph (1) with respect to new or modified sources and provide notice to all nearby States of the identity of such sources not later than three months after August 7, 1977.
 (b) Petition for finding that major sources emit or would emit prohibited air pollutants
 Any State or political subdivision may petition the Administrator for a finding that any major source emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(E)(i) of this title. Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition.
 
 
 [19]
 This section provides that the Administrator may not approve any SIP unless:
 it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility....
 42 U.S.C. Sec. 7410(a)(2)(E)(i) (emphasis added).
 
 
 [20]
 Id
 
 
 [21]
 An article on interstate pollution provides examples of two possible interpretations of the statutory language:
 The statutory goal is salutary; its meaning is doubtful. The important part of the two sections is the prohibition of emissions which will prevent attainment or maintenance of air quality standards. What, if anything, does this mean? Two extreme interpretations will illustrate the difficulty of interpreting the mandate. First, a narrow reading emphasizing the word "prevent" might conclude that section 110(a)(2)(E) [42 U.S.C. Sec. 7410(a)(2)(E) ] only requires Implementation Plan provisions which would prohibit an emitting state from causing a receiving state to be placed in violation of an Air Quality Standard, assuming that the receiving state was making no contributions to its own emission level for that Standard. In other words, interstate pollution is only prohibited to the extent that the interstate levels themselves are greater than the National Ambient Air Quality Standards. Such an interpretation is probably not harmonious with congressional intent. It is difficult to imagine a situation where an emitting state can simultaneously be in compliance with a Standard and still produce an interstate effect which would by itself exceed the applicable Standard. It is therefore unlikely that Congress would statutorily address such a rare circumstance.
 Second, a broad reading of the same language might construe it to require Implementation Plan provisions which would prohibit a state from allowing emission levels which, when netted with a receiving state's emission level, would cause the receiving state to violate an Air Quality Standard. This interpretation would place an upwind state at a disadvantage. Merely because of the prevailing meteorological conditions an upwind state would be restricted from making maximum use of a Standard while a downwind state would not be so hampered. In fact, an upwind state could find it necessary to prohibit all emissions of a given pollutant where the receiving state has made maximum use of its permitted emission level for that pollutant. The legislative histories of the 1970 Clean Air Act Amendments, which added section 110(a)(2)(E), and of the 1977 Amendments, which added section 126, do not suggest any particular interpretation of the doubtful language. They merely note that a federal enforcement mechanism is important to the resolution of interstate problems.[34]
 
 
 [34]
 H.R.REP. No. 95-294, 95th Cong., 1st Sess., reprinted in [1977] U.S.CODE CONG. & AD.NEWS 1408-10 [hereinafter cited as H.R.REP. No. 95-294]; H.CONF.REP. NO. 95-564, reprinted in [1977] U.S.CODE CONG. & AD.NEWS 1526-27.
 Hirsch & Abramovich, Clearing the Air: Some Legal Aspects of Interstate Air Pollution Problems, 18 Duq.L.Rev. 53, 67 (1979).
 
 
 [22]
 In Connecticut v. EPA, 696 F.2d 147 (2d Cir.1982), the interstate emissions were shown to have been less than 1.5% of even the secondary NAAQS for total suspended particulates. Id. at 164-65
 
 
 [23]
 See supra Section IV regarding the deference to be accorded the EPA's determinations by a reviewing court